**PNC MORTGAGE COMPANY, Appellant,**

v.

**Michael Edward DICKS, Debtor–Appellee,**

**Tedd E. Mishler, Trustee.**

**No. 3:96cv114 AS.**

United States District Court, N.D. Indiana, South Bend Division.

Aug. 12, 1996.

John P. Sieger, Feiwell and Hannoy, Indianapolis, IN, Michael Polk, Polk Scheer and Prober, Tarzana, CA, for PNC Mortgage Company.

Lynn G. Chase, South Bend, IN, for Michael Edward Dicks.

Tedd E. Mishler, Trustee, Michigan City, IN.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

Appellant PNC Mortgage Company ("PNC") appeals from a final judgment of the United States Bankruptcy Court confirming the debtor's Chapter 13 plan. PNC specifically challenges the bankruptcy court's underlying judgment denying its objection to confirmation. This court has jurisdiction over PNC's appeal pursuant to 28 U.S.C. §§ 158(a), 1334(a).

### I. BACKGROUND

The appellee, Michael Edward Dicks (the "debtor"), filed his Chapter 13 petition on June 13, 1995. Thereafter, PNC filed a proof of secured claim in the amount of $27,441.07, which sum included a pre-petition arrearage of $2636.84 and interest thereon. The appellant's claim is founded on a mortgage note and mortgage, each executed by the debtor on November 25, 1988, evidencing a loan in the original principal amount of $26,417.00 and secured by a first mortgage lien on the debtor's residential property.

On August 31, 1995, the debtor filed his Chapter 13 plan (the "plan"), which proposed to treat PNC's secured claim as follows:

> PNC Bank, Kentucky, Inc., d/b/a PNC Mortgage Company shall have their [sic] mortgage loan modified, and be granted a new mortgage in the amount of $28,196.68, which shall be repaid with 10.5% interest over a term of 25 years. The new monthly mortgage payment for principal and interest shall be $266.23, which shall be paid inside the Plan. In addition to the monthly payment for principal and interest, the debtor shall make monthly payments for taxes and insurance, into the creditor's escrow account. The current monthly escrow amount is $83.07. Therefore the current total monthly payment will be in the amount of $349.30. The total payment during the 36 month Plan term will be in the amount of $12,574.80.

Appellant's R. on Appeal at 4. PNC filed its objection to the debtor's plan on October 12, 1995, asserting that the plan fails to provide for the full payment of PNC's claim and modifies the loan documents in violation of 11 U.S.C. § 1322(b)(2) by improperly extending the term of the mortgage and mortgage note.

The bankruptcy court denied PNC's objection to confirmation on January 12, 1996, finding that "the debtor's residential mortgage to PNC falls outside the protection of the anti-modification provisions of 11 U.S.C. § 1322(b) and may be altered in the debtor's Chapter 13 Plan; [and] the debtor's proposed treatment of PNC's claim is fair and reasonable under the circumstances." Bankr.Jmt. (Jan. 12, 1996). PNC filed its notice of appeal from the judgment within the ten days allowed by Bankruptcy Rule 8002(a). Following modification of the plan pursuant to an objection by the St. Joseph County Treasurer, the bankruptcy court entered a Judgment and Special Order Confirming Chapter 13 Plan on January 29, 1996.

PNC filed its appellate brief in this court on March 25, 1996. Although Bankruptcy Rule 8009(a)(2) requires an appellee to serve and file its response brief within fifteen days after service of the appellant's brief, the debtor-appellee failed to serve or file such a response within the time provided, or to request additional time in which to do so.

## II. DISCUSSION

This appeal presents two issues for review: (1) whether the enumerated items of collateral in the mortgage are conceptually included within the debtor's residential property such that Section 1322(b)(2) of the Bankruptcy Code (the "Code") proscribes modification of the appellant's claim; and (2) whether the debtor's confirmed plan, by failing to cure existing defaults within the five-year period provided under 11 U.S.C. § 1322(d), violates Section 1322(b)(5) of the Code.

### A. Standard of Review

■ A district court sitting as an appellate tribunal pursuant to 28 U.S.C. § 158(a) must accept a bankruptcy court's factual findings unless they are clearly erroneous. Fed.R.Bankr.P. 8013; *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993); *Calder v. Camp Grove State Bank*, 892 F.2d 629, 631 (7th Cir.1990). If the bankruptcy court's account of the evidence is plausible in view of the record in its entirety, the district court may not reverse even though convinced that as trier of fact it would have weighed the evidence differently. *In re Love*, 957 F.2d 1350, 1354 (7th Cir. 1992); *see Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). "A finding [of fact] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994) (citations omitted). Mixed questions of law and fact are similarly reviewed for clear error when they involve fact specific applications of law. *Schiro v. Clark*, 963 F.2d 962, 974 (7th Cir.1992), *aff'd sub nom. Schiro v. Farley*, 510 U.S. 222, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994); *United States v. Levy*, 955 F.2d 1098, 1103 n. 5 (7th Cir.), *cert. denied*, 506 U.S. 833, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992).

By contrast, a bankruptcy court's conclusions of law are subject to *de novo* review by the district court. *In re Sheridan,* 57 F.3d 627, 633 (7th Cir.1995); *Meyer v. Rigdon,* 36 F.3d 1375, 1378 (7th Cir.1994); *Magill v. Newman (In re Newman),* 903 F.2d 1150, 1152 (7th Cir.1990); *Calder,* 892 F.2d at 631. *De novo* review requires the district court to make an independent examination of the bankruptcy court's judgment without giving deference to that court's analysis or conclusions. *See Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1210 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984).

### B. Modification of Debtor's Residential Mortgage

Chapter 13 of the Bankruptcy Code permits individual debtors to structure repayment of their indebtedness through a flexible repayment plan approved by the bankruptcy court and supervised by a standing trustee. Thus, unlike debtors who opt for liquidation under Chapter 7, Chapter 13 debtors may retain their property by agreeing to repay creditors over a period not exceeding five years. *See* 11 U.S.C. § 1322(a)(1), (d) (1994).

Section 1322(b) sets forth ten provisions which a debtor may employ in a proposed Chapter 13 plan. Although the Code generally permits modification of creditors' claims to allow a debtor to repay debts over the life of a Chapter 13 plan, it expressly prohibits modification of claims secured only by a mortgage on the debtor's principal residence. Section 1322(b)(2), the provision at issue here, provides that the plan may

modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

11 U.S.C. § 1322(b)(2) (1994) (emphasis supplied). This anti-modification provision was intended to make home mortgage funds more accessible to homeowners by assuring lenders that their expectations would not be frustrated. *See First Nat'l Fidelity Corp. v.*

*Perry,* 945 F.2d 61, 63 (3d Cir.1991); *Grubbs v. Houston First Am. Sav. Ass'n,* 730 F.2d 236, 246 (5th Cir.1984) (en banc); *Bankruptcy Reform Act of 1978: Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 95th Cong., 1st Sess. 707, 715 (1977) (statement of Robert E. O'Malley).

By virtue of its mortgage contract with the debtor, PNC is undisputably the holder of a claim secured by a lien on the debtor's home. However, the issue here is whether the security interest described in the PNC mortgage extends beyond the debtor's principal residence and thus falls outside the protection of § 1322(b)(2). The debtor's mortgage provides that PNC holds a security interest in

all buildings and improvements thereon (or that may hereafter be erected thereon); together with the hereditaments and appurtenances and all other rights thereunto belonging, or in anywise now or hereafter appertaining, and the reversion and reversions, remainder and remainders, rents, issues, profits thereof, and all plumbing, heating and lighting fixtures, and equipment now or hereafter attached to or used in connection with said premises.

Appellant's R. on Appeal at 14. The bankruptcy court found that the above-described security interest constitutes additional security beyond the debtor's principal residence. Thus, the court concluded as a matter of law that PNC's claim was subject to modification by the debtor's Chapter 13 plan.

PNC advances a number of arguments against the bankruptcy court's judgment. The appellant contends that the decision of the Supreme Court of the United States in *Nobelman v. American Sav. Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), although not "on all fours" with the present case, necessarily determined that the type of security interest held by PNC is subject to the protection of § 1322(b)(2); that many courts have concluded that common boilerplate language of the type included in the PNC mortgage instrument does not constitute additional security precluding application of § 1322(b)(2); that any additional se-

curity arguably granted PNC is illusory; that no evidence was introduced to support the existence or value of additional security; and that the bankruptcy court's strict interpretation of the anti-modification provision undermines congressional intent by allowing emasculation of the protection intended to be provided under § 1322(b)(2).

In *Nobelman*, the Supreme Court addressed the question of whether a debtor may "strip down" (or "cramdown") an undersecured home mortgage lien by bifurcating the lender's claim into secured and unsecured components—the secured portion being the fair market value of the principal residence and the unsecured amount being the difference between the balance owed on the lender's claim and the fair market value of the residence. The Court rejected the petitioners' argument that the special protection offered by § 1322(b)(2) extends only to the amount of the creditor's "secured claim" (*i.e.*, the fair market value of the residence) as determined by 11 U.S.C. § 506(a). *Nobelman*, 508 U.S. at 331, 113 S.Ct. at 2111. Thus, the Court found that although a creditor whose only security is the debtor's principal residence may be undersecured, § 1322(b)(2) protects the mortgage lender's entire claim and lien from modification—*i.e.*, "cramdown." *Id.*

The appellant contends that although *Nobelman* did not expressly address the question before this court, the decision in that case necessarily resolved the issue of whether the Nobelmans' deed of trust fell within the purview of § 1322(b)(2): in order for the Supreme Court to reach the issue of whether

bifurcation of the claim violated § 1322(b)(2), the Court first needed to determine that the deed was actually subject to the provisions of § 1322(b)(2). *See Nobelman*, 508 U.S. at 332, 113 S.Ct. at 2111 ("Section 1322(b)(2) prohibits such a modification where, *as here*, the lender's claim is secured only by a lien on the debtor's principal residence.") (emphasis supplied). Therefore, the appellant argues that because the security provisions in the PNC mortgage are "materially identical" to those in the Nobelman deed,[1] the bankruptcy court erred by concluding that PNC's claim is not afforded the protection of § 1322(b)(2).

While at least one court has provided support for the above argument, *see Citicorp Mortgage, Inc. v. Hirsch (In re Hirsch)*, 166 B.R. 248, 253–54 (E.D.Pa.1994), this court finds that *Nobelman*, by itself, is not dispositive of the case at bar. Notwithstanding the apparent logic of the appellant's argument, there is a substantial question as to the weight to be accorded the *Nobelman* decision in the present case. The *Nobelman* Court explicitly states that it granted *certiorari* for the purpose of resolving a conflict among the circuit courts of appeals on the issue of bifurcation of undersecured homestead mortgages—*not* on the specific issue of what secured claims are to be considered claims "secured only by a security interest in real property that is the debtor's principal residence." *See Nobelman*, 508 U.S. at 327 & n. 2, 113 S.Ct. at 2109 & n. 2.

Moreover, since the petitioners apparently conceded that the mortgage was within the scope of § 1322(b)(2)[2] and did not raise the

---

1. The Nobelman deed of trust provided for an additional security interest in .67 percent interest in the common areas of the condominium complex, escrow funds, proceeds of hazard insurance,

> "[t]ogether with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, ... royalties, mineral, oil and gas rights and profits, water, water rights, and water stock, and all fixtures now or hereafter attached to the property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the property covered by this Deed of Trust."

*Citicorp Mortgage, Inc. v. Hirsch (In re Hirsch)*, 166 B.R. 248, 251–52 (E.D.Pa.1994) (quoting No-

belman Deed of Trust, attached to Respondent's Brief of Standing Chapter 13 Trustee, in *Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (No. 92–641)).

2. Although the Nobelmans originally argued in the alternative that the deed of trust provided for additional security and therefore fell outside the protection of § 1322(b)(2), the district court dismissed that contention as being "without merit." *Nobelman v. American Sav. Bank (In re Nobelman I)*, 129 B.R. 98, 104 (N.D.Tex.1991). The Fifth Circuit decision affirming the district court decision noted the security language without specifically addressing its effect. *See Nobleman v. American Sav. Bank (In re Nobleman II)*, 968 F.2d 483, 484 n. 3 (5th Cir.1992).

issue of additional security either in their petition for writ of *certiorari* or at oral argument, it is conceivable that the Court did not consider that question in reaching a decision on the issue of bifurcation. *See* Brief for Petitioner, *Nobelman* (No. 92–641), 1993 WL 669008, at \*i; Transcript of Oral Argument, *id.*, 1993 WL 751847. Indeed, the *Nobelman* Court neither noted nor addressed the effect of the security language. Finally, even assuming that the Court determined preliminarily that the Nobelman deed of trust did in fact fall within the purview of § 1322(b)(2), this court will not base its decision here on *Nobelman* since the specific terms of the security interest retained by PNC contain an item not found in the Nobelman deed of trust (equipment).

Neither the Supreme Court of the United States nor the United States Court of Appeals for the Seventh Circuit has reported a decision expressly addressing what type of additional collateral will divest the holder of a claim secured by a debtor's principal residence of the protection afforded by § 1322(b)(2). Further, no unreported decision by the Seventh Circuit is known to exist. Although several other courts have considered this issue, no consensus has emerged. In determining that the security interest in the PNC mortgage removes the protection of § 1322(b)(2), the bankruptcy court appears to base its conclusion at least in part on a statement in *In re Graham*, 144 B.R. 80 (Bankr.N.D.Ind.1992) (Robert E. Grant, J.), wherein the bankruptcy court noted that "[m]ore courts seem to hold that such language does deprive the lenders of these protections than those which hold they do not." *Id.* at 82.

This court is not persuaded by the statement in *Graham*. First, a number of courts have weighed in post-*Graham* on the side of protecting lenders whose security interests include rights similar to those described in the PNC mortgage, including at least two circuit courts of appeals. In fact, the weight of authority seems to have shifted toward holding that such language does not deprive lenders of the protection of § 1322(b)(2).[3]

**3.** *Compare Allied Credit Corp. v. Davis (In re Davis)*, 989 F.2d 208 (6th Cir.1993) (security interest in hereditaments and appurtenances, rents, royalties, profits and fixtures does not remove protection of § 1322(b)(2)); *In re Washington*, 967 F.2d 173 (5th Cir.1992) (security interest in credit life and disability insurance does not divest holder of protection of § 1322(b)(2)); *Citicorp Mortgage, Inc. v. Hirsch (In re Hirsch)*, 166 B.R. 248 (E.D.Pa.1994) (unless lender actually took security in addition to real property, terms including appliances, machinery, furniture and equipment do not remove protection of § 1322(b)(2)); *In re French*, 174 B.R. 1 (Bankr. D.Mass.1994) (security interest in fixtures or personalty that are or can be made component parts of the real property does not remove protection of § 1322(b)(2)); *In re Halperin*, 170 B.R. 500 (Bankr.D.Conn.1994) (security interest in rents, royalties, oil and gas rights, profits, stocks and fixtures does not remove protection of § 1322(b)(2)); *In re Harris*, 167 B.R. 813 (Bankr. D.S.C.1994) (security interest in rents and fixtures does not remove protection of § 1322(b)(2)); *Miami Valley Bank v. Lutz (In re Lutz)*, 164 B.R. 239 (Bankr.W.D.Pa.1994) (security interest in buildings, improvements and fixtures, hereditaments, appurtenances, rents, issues and profits, and appliances does not remove protection of § 1322(b)(2)); *In re Spano*, 161 B.R. 880 (Bankr.D.Conn.1993) (security interest in fixtures and hazard insurance does not remove protection of § 1322(b)(2)); *In re Pruitte*, 157 B.R. 662 (Bankr.E.D.Mo.1993) (security interest in improvements, easements, rights, appurtenances, water rights and fixtures does not remove protection of § 1322(b)(2)); *In re Lee*, 137 B.R. 285 (Bankr.E.D.Wis.1991) (security interest in assignment of rents does not remove protection of § 1322(b)(2)); *Dent v. Associates Equity Servs. Co., Inc. (In re Dent)*, 130 B.R. 623 (Bankr. S.D.Ga.1991) (although security interest in assignment of rents does not remove protection of § 1322(b)(2), security interest in escrow payments does); *Wright v. C & S Family Credit, Inc. (In re Wright)*, 128 B.R. 838 (Bankr.N.D.Ga. 1991) (security interest in machinery, apparatus, equipment, fittings and fixtures actually or constructively attached to real property does not remove protection of § 1322(b)(2)); *Equity Inv. Co. v. Moreland (In re Moreland)*, 124 B.R. 921 (Bankr.D.Conn.1991) (security interest in rents, royalties, oil and gas rights, profits, stock and fixtures does not remove protection of § 1322(b)(2)); *In re Williams*, 109 B.R. 36 (Bankr.E.D.N.Y.1989) (security interest in appliances and fixtures does not remove mortgage from protection of § 1322(b)(2)), *with Lomas Mortgage, Inc. v. Louis*, 82 F.3d 1 (1st Cir.1996) (security interest in income-producing units on same property as debtor's principal residence removes mortgage from protection of § 1322(b)(2)); *Johns v. Rousseau Mortgage Corp. (In re Johns)*, 37 F.3d 1021 (3d Cir.1994) (security interest in appliances, machinery, furniture and equipment removes mortgage from protection of § 1322(b)(2)); *Hammond v. Commonwealth Mortgage Corp. of Am. (In re Hammond)*,

Second, the *Graham* court did not decide whether so-called "boilerplate" security language removes a mortgage from the protection of § 1322(b)(2). *See Graham*, 144 B.R. at 83 ("Although courts may differ on what property is so associated with residential real estate that is not additional security, the dragnet clauses in [the lender's] subsequent mortgages create dramatically different rights than those which have been considered by other bankruptcy courts.") (internal citations omitted) (alteration supplied). Thus, because the mortgage in *Graham* secured rights distinctly different from those secured by the PNC mortgage (and because the quote relied upon by the court below was not necessary to the *Graham* decision), *Graham* is not dispositive here.

The bankruptcy court did not articulate what items encumbered by the mortgage constitute additional security and thereby divest PNC of the protection of § 1322(b)(2). However, it is beyond question that some of the components in the PNC security clause are merely incidental to property ownership. For example, it is clear that when a home mortgage lender makes a loan on a principal residence, the lender takes a security interest in buildings and improvements erected thereon. *In re Spano*, 161 B.R. 880, 884 (Bankr.D.Conn.1993). Moreover, most courts agree that "hereditaments" and "appurtenances" are by their very nature incidental to an interest in real property. *See, e.g., Allied Credit Corp. v. Davis (In re Davis)*, 989 F.2d 208, 212 (6th Cir.1993); *In re Lutz*, 164 B.R. 239, 242–43 (Bankr.

W.D.Pa.1994); *In re Pruitte*, 157 B.R. 662, 664 (Bankr.E.D.Mo.1993); *but see Secor Bank, Fed. Sav. Bank v. Dunlap*, 129 B.R. 463, 465 (E.D.La.1991). Nevertheless, courts are sharply divided on the issue of whether a security interest in such items as rents, issues and profits derived from the property, or plumbing, heating and lighting fixtures or equipment attached to the property, removes a mortgage from the protection of § 1322(b)(2). *See supra* note 3.

■ This court gives no weight to the appellant's argument that the language in the mortgage granting PNC a security interest in "rents, issues, profits thereof, and all plumbing, heating and lighting fixtures, and equipment now or hereafter attached to or used in connection with said premises" is mere "boilerplate" language commonly included in mortgages. First, the language of mortgage instruments is intensely technical in nature, and this court is not prepared to find that particular items of collateral constitute "boilerplate" terms. Second, the appellant presumably included this lengthy enumeration for a reason and, in the event of default, would likely defend its right to a security interest in each and every item of collateral described therein. Third, even if the appellant had no subjective intent to acquire an additional security interest, § 1322(b)(2) will not protect PNC's claim from modification if the mortgage instrument includes items not conceptually within "real property that is the debtor's principal residence."

27 F.3d 52 (3d Cir.1994) (same); *Wilson v. Commonwealth Mortgage Corp.*, 895 F.2d 123 (3d Cir.1990) (same); *In re Escue*, 184 B.R. 287 (M.D.Tenn.1995) (security interest in heating, plumbing, lighting, cooking, refrigerating and other equipment removes mortgage from protection of § 1322(b)(2)); *In re Guilbert*, 176 B.R. 302 (D.R.I.1995) (security interest in equipment and tangible personal property removes mortgage from protection of § 1322(b)(2)); *Hutchins v. Commonwealth Mortgage Corp.* 165 B.R. 401 (E.D.Pa.1994) (security interest in appliances, machinery, furniture and equipment removes protection of § 1322(b)(2)); *In re Jackson*, 136 B.R. 797 (N.D.Ill.1992) (although security interest in fixtures and insurance proceeds does not remove protection of § 1322(b)(2), interest in rents, issues and profits does); *Peoples First Nat'l Bank v. Haraschak (In re Haraschak)*, 169 B.R.

325 (Bankr.M.D.Pa.1994) (security interest in improvements, fixtures, appliances and equipment removes protection of § 1322(b)(2)); *Third Nat'l Bank & Trust Co. v. Tallo (In re Tallo)*, 168 B.R. 573 (Bankr.M.D.Pa.1994) (security interest in rents, issues and profits removes mortgage from protection of § 1322(b)(2)); *Secor Bank, Fed. Sav. Bank v. Dunlap*, 129 B.R. 463 (E.D.La.1991) (security interest in easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures, as well as in all funds escrowed for payment of taxes and insurance, removes mortgage from protection of § 1322(b)(2)); *Kessler v. Homestead Sav. (In re Kessler)*, 99 B.R. 635 (Bankr.E.D.Pa.1989) (security interest in plumbing, cooking, heating and lighting fixtures, appliances and other appurtenances removes mortgage from protection of § 1322(b)(2)).

■ The precise issue here is whether the collateral listed extends beyond a description of components of "real property" and purports to create a security interest in personalty that may have value independent from the debtor's principal residence. The Code does not define the term "real property." Although some courts have turned to state law to determine whether individual items of collateral are included within the phrase "real property," *see Spano,* 161 B.R. at 884; *Lutz,* 164 B.R. at 243, this court adheres to the view that the question of whether the inclusion of an item of collateral is sufficient to deny a mortgagee the protection of § 1322(b)(2) is a matter of federal bankruptcy law. *See In re French,* 174 B.R. 1, 7 (Bankr.D.Mass.1994); *see also Escue,* 184 B.R. 287, 291 (Bankr.M.D.Tenn.1995). Thus, given the lack of plain meaning of § 1322(b)(2), the court must look to the legislative history of the provision to determine what rights are included in the appellant's claim.

Section 1322(b)(2) was enacted as part of the Bankruptcy Code of 1978. In the original language of House Bill 8200, § 1322(b)(2) allowed for modification of *any* secured claim, including, apparently, the claims of secured creditors on residential mortgages. *See* H.R.REP. No. 595, 95th Cong., 1st Sess. 124, *reprinted in* 1978 U.S.C.C.A.N. 5787, 6085. This provision aroused concern that lenders would be forced to recognize an additional business risk and would take a much more conservative approach to residential mortgages, thus reducing the flow of money into the home mortgage market. *See Bankruptcy Reform Act of 1978: Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 95th Cong., 1st Sess. 707, 714–15 (1977) (statements of Edward J. Kulik, senior vice-president, Real Estate Div., Massachusetts Mutual Life Ins. Co., and Robert E. O'Malley, attorney, Covington & Burling).

In response to testimony by secured creditors' advocates, Senate Bill 2266 (the Senate's amended version of H.R. 8200) prohibited modification of all claims "secured wholly by real estate mortgages." S.REP. No. 989,

95th Cong., 2d Sess. 141, *reprinted in* 1978 U.S.C.C.A. 5927. However, after a series of floor amendments in both Houses, the final, narrower version of § 1322(b)(2) proscribed modification of claims "secured only by a security interest in real property that is the debtor's residence." 11 U.S.C. § 1322(b)(2). This final version has been described as a reconciliation and a compromise between the two Houses' bills. *See Lomas Mortgage, Inc. v. Louis,* 82 F.3d 1, 5 (1st Cir.1996); *Grubbs v. Houston First Am. Sav. Assoc.,* 730 F.2d 236, 246 (5th Cir.1984).

It appears from the legislative history of § 1322(b)(2) that Congress intended to strike a balance between its expressed policy of making repayment plans more attractive to debtors and its concern that home mortgage funds remain accessible to prospective homeowners. Thus, the language of § 1322(b)(2) is narrowly drafted to protect principal mortgage lenders and yet avoid extending the protection to holders of secured claims which are based on extraneous consumer purchases:

No preferential treatment was given debts secured by property in addition to the debtor's principal residence. Such debts normally are incurred to make consumer purchases unrelated to the home or to enable the debtor to engage in some form of business adventure. In such circumstances the home is mortgaged not for its own sake, but for other purposes, and often is only one of several forms of security given.... Congress granted no extra protection for holders of these types of secured claims, presumably because any impact the bankruptcy laws might have upon them would not seriously affect the money market for home construction or purchase.

*Federal Land Bank of Louisville v. Glenn (In re Glenn),* 760 F.2d 1428, 1434 (6th Cir.), *cert. denied sub nom. Miller v. First Fed. of Michigan,* 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985).

In spite of the precise language of the antimodification provision (or perhaps *because* of it), courts have experienced great difficulty in applying § 1322(b)(2) to real world Chapter 13 plans:

The "boilerplate" case law is hopelessly irreconcilable because Congress did not contemplate that the intensely technological language of mortgage instruments would be tested against the simple but precise language of § 1322(b)(2).... Without congressional action, after *Nobelman* there is every incentive for debtors to microscopically parse the language of every mortgage instrument in search of errant appurtenances, hereditaments, and other morsels of unreal collateral in hopes of upsetting the sanctity of the "rights" protected from modification by § 1322(b)(2). No peace will come to this area of law until Congress clarifies the statute.

KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 4.44 (1994). However, notwithstanding the need for legislative clarification of § 1322(b)(2), this court cannot conceive that Congress intended to deny bona fide home mortgage lenders the protection of § 1322(b)(2) solely on the basis of their inclusion of non-income-producing items of collateral in the mortgage instrument. To state, as one court has, that a lender should delete such language if it wishes to avoid modification, *see In re Hammond,* 27 F.3d 52, 57 (3d Cir.1994), is to say that Congress intended to deny protection to all lenders who failed to renegotiate existing mortgages having such language.

■ The United States Bankruptcy Court for the District of Massachusetts recently developed a test for determining when collateral extends beyond a description of components of "real property" and purports to create a security interest in personalty that may have value independent from the debtor's principal residence. *See French,* 174 B.R. at 7. Based upon the apparent congressional intent behind the anti-modification provision, this court agrees with the *French* court that the appropriate test is whether (1) the items of collateral set forth in the mort-

gage instrument are merely enhancements that can be made component parts of the real property; and (2) are of little or no independent value. *See id.; see also Escue,* 184 B.R. at 291. If the items of collateral in the mortgage meet both elements of this standard, § 1322(b)(2) forbids modification of the mortgagee's claim. This interpretation comports well with congressional intent to "encourage the flow of capital into the home lending market," *Nobelman,* 508 U.S. at 332, 113 S.Ct. at 2112 (Stevens, J., concurring), and to protect "the rights that were 'bargained for by the mortgagor and the mortgagee.'" *Id.* at 329, 113 S.Ct. at 2110 (main opinion) (quoting *Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992)).

The record on appeal from the bankruptcy court betrays no evidence that the PNC mortgage was drafted to secure consumer purchases unrelated to the debtor's home or to enable the debtor to engage in some form of business adventure. Rather, the evidence before the court leads inexorably to the conclusion that the items of collateral described in the PNC mortgage are nothing more than enhancements capable of becoming component parts of the debtor's principal residence, and that such items of collateral are of little independent value relative to the residence property.[4] Therefore, the court holds as a matter of law that the claim at issue here is secured only by a lien on the debtor's principal residence. Accordingly, the appellant is entitled to the protection of § 1322(b)(2).

### C. Full Cure of Defaults

■ The appellant also contends that the debtor's plan seeks an impermissible modification of its claim by reducing the amount due PNC. Specifically, PNC argues that by adding the pre-petition arrearages to the remaining principal balance for repayment over a twenty-five-year term, the plan violates the

---

4. This conclusion is in harmony with the Sixth Circuit's decision in *Allied Credit Corp. v. Davis (In re Davis),* 989 F.2d 208 (6th Cir.1993), wherein the court of appeals concluded that items of collateral such as hereditaments and appurtenances, rents, royalties, profits and fixtures were merely incidental to the interest in real property. Moreover, the court's determination is not at

odds with the First Circuit's recent decision in *Lomas Mortgage, Inc. v. Louis,* 82 F.3d 1 (1st Cir.1996), which held that § 1322(b)(2) does not bar modification of a secured claim on a multi-unit property where the evidence shows that the security interest extends to other income-producing units in addition to the unit which is the debtor's principal residence.

combined requirements of § 1322(b)(5) and § 1322(d) that any defaults must be cured within a reasonable time not to exceed five (5) years.

Section 1322(b)(5) provides the sole exception to § 1322(b)(2)'s protection of home mortgage lenders. Under § 1322(b)(5), a debtor may reverse the lender's acceleration of the mortgage debt by providing a cure for the default which precipitated the acceleration. Although deacceleration and reinstatement of the original mortgage terms arguably are modifications within the meaning of § 1322(b)(2), the language of § 1322(b)(5) makes clear that a debtor may cure a mortgage default in spite of the prohibition in § 1322(b)(2). *See In re Clark,* 738 F.2d 869, 872 (7th Cir.1984). Section 1322(b)(5) provides in relevant part:

> **(b)** Subject to subsections (a) and (c) of this section, the plan may—
>
> .  .  .  .  .
>
> **(5)** notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due[.]

11 U.S.C. § 1322(b)(5) (1994).

A leading authority on bankruptcy has concisely described the operation of § 1322(b)(5):

> The debtor is permitted to include a provision in the chapter 13 plan proposing to cure any default and to maintain payments during the pendency of the chapter 13 case on any claim, secured or unsecured, on which the last payment is due after the due date of the final payment under the plan. Section 1322(b)(5) is concerned with relatively long term debt, such as a security interest or mortgage debt on the residence of the debtor. It permits the debtor to take advantage of a contract repayment period which is longer than the chapter 13 extension period, which may not exceed five years under any circumstances, and may be essential if the debtor cannot pay

the full allowed secured claim over the term of the plan.

5 Lawrence P. King et al., Collier on Bankruptcy ¶ 1322.09[1] (1992) (footnotes omitted) (hereinafter Collier). Thus, when a default on a mortgage is cured under § 1322(b)(5), the full amount of the creditor's claim is not paid during the Chapter 13 case. "Rather, the debtor preserves the benefit of a longer payment schedule which extends beyond the due date of the last payment under the plan, and the creditor is protected by the exception to discharge for long term debts on which defaults are cured." *In re Chappell,* 984 F.2d 775, 781 (7th Cir.1993) (citing Collier at ¶ 1322.09[4] ); *see also Sapos v. Provident Inst. of Sav.,* 967 F.2d 918, 922 (3d Cir.1992) (the "cure-and-maintain option" of § 1322(b)(5) "gives the debtor an alternative to cramming down the creditor's claim and paying it off within the chapter 13 plan.").

It is clear, then, that the provision under 11 U.S.C. § 1322(d) that Chapter 13 plans cannot exceed five years in duration does not apply to defaults cured pursuant to § 1322(b)(5). Accordingly, the appellant's argument that the plan cannot cure the debtor's defaults by spreading repayment of arrearages over a twenty-five-year term must fail.

## CONCLUSION

For the reasons described above, the judgment of the bankruptcy court is **AF-FIRMED IN PART** and **REVERSED IN PART.** The decision of the bankruptcy court confirming the debtor's plan to cure his defaults over the full term of the mortgage is **AFFIRMED.** The bankruptcy court's denial of the appellant's objection to confirmation with respect to § 1322(b)(2) of the Bankruptcy Code is **REVERSED.** This cause of action is **REMANDED** to the bankruptcy court for further proceedings consistent with this opinion. **IT IS SO ORDERED.**